Ragland v. Anderson, &c.

and cause remanded for a new trial and further proceedings consistent with the opinion.   Whole court sitting.

CASE 18.—ACTIONS BY S. A. ANDERSON AGAINST M. S. RAGLAND AS CHAIRMAN OF THE REPUBLICAN COMMITTEE OF THE 25TH LEGISLATIVE REPRESENTATIVE DISTRICT, AND BY C. P. KEOWN AGAINST W. S. TINSLEY, CLERK OF THE OHIO COUNTY COURT, TO TEST THE CONSTITUTIONALITY OF THE ACT OF THE KENTUCKY LEGISLATURE OF MARCH 23, 1906, APPORTIONING THE STATE INTO REPRESENTATIVE DISTRICTS.— March 20.

# Ragland v. Anderson, &c.
# Tinsley, Clerk, v. Keown

.Appeals from Butler Circuit Court and Ohio Circuit Court.

JOHN M. GALLOWAY, Circuit Judge.

From the judgment in favor of plaintiffs in each case defendants appeal.   Affirmed.

1.  Constitutional Law—Courts—Jurisdiction—Representative Districts—Political Question.—Whether a statute redistricting the state into representative districts makes a division so unequal as to be a violation of Const., section 33, requiring such division to be in proportion to population, is not so purely a political question as to be beyond the jurisdiction of the courts.

2.  States—Division—Representative   Districts—Equality.—Act March 23 1906 (Acts 1906, p. 472, c. 139, redividing the state into representative districts and placing Ohio, Butler, and

Ragland v. Anderson, &c.

Edmonson counties, with a population of 53,263 and a combined area of 1,241 square miles, into one district with only one representative, while Spencer county, with only 7,407 population and 204 square miles, is made a district by itself, entitled to one representative, constituted such an unequal division as to violate Const., section 33, requiring a division of the state into districts as nearly equal in population as may be without dividing any county except where a county may include more than one district, etc.

3.  Same—Formation of Districts.—Const., section 33, provides for the division of the state into 100 representative districts as nearly equal in population as may be without dividing any county except where a county may include more than one district, that in making such division not more than two counties shall be joined together to form a representative district, and that no part of a county shall be added to another county to make a district. Held, that such section does not absolutely prohibit the joining of more than two counties to form a representative district, provided it be necessary to effectuate that equality of representation demanded by the whole section.

LEWIS McQUOWN, BARNETT & SMITH and M. L. HEAVRIN, attorneys for appellants.

POINTS AND AUTHORITIES CITED.

1.  It is well settled that a court of equity will not enjoin the holding of an election. The rule rests upon two grounds: First, the imperative necessity of allowing an expression of the popular will by election. Second, the statutory remedies provided for relief. (Spelling Ex. Relief, sec. 630; Harris v. Schryock, 82 Ill., 119; Clayton v. Calhoun, 76 Ga., 276; Walton v. Develing, 61 Ill., 201; McKinney v. County Comrs. (Fla.) 3 So., 887; People v. Galesberg, 48 Ill., 485; Smith v. McCarthy, 56 Pa. St., 359.)

2.  A primary election under the law of Kentucky is, in all respects placed upon the same footing as a final election. It must be held under the statute. The courts, therefore, will not enjoin the authorities from holding such an election.

3.  Equity will not enjoin a violation of political rights. The rights sought to be protected in this case are merely political rights, and equity will not protect them by injunction. This question was exhaustively examined and determined by the supreme court of Illinois in the cases of Fletcher v. Tuttle, and Blair v. Hinrichen, 151 Ill., 41.

4. The exercise of the power conferred, involves legislative discretion. The Legislature is required to consider many troublesome questions of fact. Of these questions, the Legislature is the sole judge, and its determination is conclusive upon the judiciary, otherwise confusion and demoralization would ensue. Such results have followed in Wisconsin and Indiana upon the assumption of jurisdiction by the courts to sit in judgment upon the decision of these questions by the Legislature.

5. The court must assume that the Legislature investigated and ascertained the population; it must be assumed that it investigated and determined that an apportionment was necessary. This much must be conceded.

JAMES S. MORRIS, attorney for appellants.

POINTS AND AUTHORITIES CITED.

1. The demurrers to the petition only admits the facts of which the court will take judicial notice. No triable issue of fact can be framed. (Wisconsin v. Cunningham, 15 L. R. A., 561.)

Therefore as no enumeration nor census is required by the Constitution of Kentucky—the allegations as to population of the districts under act in question are not admitted.

2. A consideration of the provisions of the three former Constitutions of Kentucky as compared with the present one, in connection with the debates of the last convention—shows that the means of determining the population, and arriving at a reasonable equality in apportionment, were left within the discretion of the General Assembly. (See 1st Const. of Ky., art. 1, sec. 6; 2nd Const. of Ky., art. 2, sec. 6; 3rd Const. of Ky., art. 2, sec. 6; 4th Const. of Ky., art. —, sec. 33. See also debates of last Constitutional Convention (1890) vol. 3, p. 4387 to vol. 4, p. 4444 to 4631.)

3. If the apportionment complained of is unconstitutional, so is that of May 23, 1893, (Ky. Stats., sec. 2003), under which appellees are seeking to hold the elections for representatives. Therefore the court will grant no relief. (Giddens v. Blacken (Mich.) 16 L. R. A., 402; Parker v. Indiana, 18 L. R. A., 567-69-76; Nevada v. Stodard, 51 L. R. A., 229.)

4. The Constitution (sec. 38), having made each house of the General Assembly exclusive "Judges of the qualifications, elections and returns of its members" (except as to contests), the judgments of this court cannot be conclusive or effectual. The House of Representatives will have the exclusive right to decide what counties or districts have properly nominated and elected their respective representatives.

Ragland v. Anderson, &c.

So the questions involved in these appeals are thus shown to be political and over them the courts have no jurisdiction, and should not undertake to exercise control.

W. A. HALBERT and WORTHINGTON & COCHRAN for appellees.

### POINTS AND AUTHORITIES CITED.

1. State Legislatures are subject to implied restrictions as well as express prohibitions, and an act of the Legislature may be declared void though not expressly prohibited by the Constitution. (City of Lexington v. Thompson, 113 Ky., 545-6-7; Davis v. Ballard, 1 J. J. Mar., 566; Cooley Const. Lim. (5th Ed.) p. 303.)

2. The courts have jurisdiction to determine whether or not an act of apportionment is in conflict with the limitations fixed by the constitution, and, if such conflict is found to exist, to declare the act void. (2 Am. & Eng. Ency. of Law (2nd Ed.) 485); McPherson v. Blacer, 146 U. S., 1, 36 L. C. P. Co., ·873; State v. Cunningham, 81 Wis., 440; Same v. Same, 83 Wis., 90, 35 Am. St. Rep., 27; Board of Supervisors of Houghton County v. Blacker, Secretary of Stá'e, 92 Mich., 638; Giddings v. Same, 93 Mich., 1; Morris, &c., v. Wrightson, &c., 56 N. J. Law, 188; Parker v. State, 133 Ind., 178; Denny, Clerk, &c., v. State, 144 Ind., 503; People v. Rice, 135 N. Y., 473; Baird v. Board of Supervisors of Kings County, 138 N. Y., 95; People v. Thompson, 155 Ill., 484; Ballentine v. Willey, 3 Idaho, 506; People v. Cannady, 73 N. Car., 224; Harmison v. Ballot Connor, 45 W. Va., 179; Winnie v. Stoddard, 51 L. R. A., 231 (Nevada.)

3. The citizen in a Republican form of government can have no higher or more sacred privilege than the right of equal representation and control of the law-making department of his government so far as it is practicable to give such equality and uniformity by the instrumentality of apportionment laws, and when this right and privilege is invaded and he is despoiled of his rights he has the legal right to maintain an action in his own name and right to enforce his constitutional privilege. (People v. Thompson, 155 Ill., 484; People v. Rice, 135 N. Y., 473; Baird, &c., v. Board of Supervisors of Kings County, 138 N. Y., 95; Giddings v. Blacker, 93 Mich., 1; Morris, &c., v. Wrightson, &c., 56 N. Jersey Law, 188; Parker v. State, 133 Ind., 178; Denney, Clerk, v. State, 144 Ind., 503; Massengale, Clerk, &c., v. Lester, &c., 104 Ky., 201; Neal v. Young, 75 S. W., 1082.)

4. The courts will take judicial notice of a. census, whether taken under the authority of the state or United States; also they

Ragland v. Anderson, &c..

take judicial knowledge of the location, general boundaries, area,, and juxtaposition of the several counties mentioned in the act in question, as well as of matters of common knowledge. (State v. Cunningham, 81 Wis., 510; State v. Cunningham, 83 Wis., 90, 35 Am. St. Rep., 47; Saukville v. State, 69 Wis., 178; Woods v. Henry, 55 Mo., 560; Board of Commissioners of Jackson County v. State, et al., 147 Ind., 497; Wright v. Hawkins, 28 Texas, 452; Carter County v. Brooks, 83 S. W., 446; 7 Am. & Eng. Ency. of Law (2nd Ed.) 908; 87 Iowa, 588; 64 Cal., 87; 30 S. W. Rep. (Mo.) 103.)

W. H. HOLT and GEORGE DuRELLE for appellees.

### POINTS.

1. Whether a legislative apportionment act is constitutional is a judicial and not a political question.

2. A voter and candidate or a voter only, may sue to test its validity.

3. A legislative apportionment act so grossly unequal as to population and territory as to show it was passed ignoring equality of representation, is unconstitutional and therefore, invalid. Purnell v. Mann, 105 Ky., 91; Massengale, Clerk, v. Lester 104 Do., 191; McPherson v. Blacker, 146 U. S., 224; Giddings v. Blacker, 93 Mich., 1; Houghton County Supervisors v. Blacker, 16 L. R. A., 432; Williams v. Prescott, Mich., July 24, 1906; Parker v. State, 133 Ind., 178; State v. Cunningham, 81 Wisc., 446; Same v. Same, 83 Do., 90; People v. Thompson, 155 Ill., 451; Kentucky Constitution, sec. 33; Denny v. State, 144 Ind., 503; State v. Wrightson, 56 N. J. Law, 126; Brooks case, 162 Ind., 568; 2 Am. & Eng. Ency., 485, note 3.)

OPINION OF THE COURT BY JUDGE BARKER—Affirming.

These cases involve the constitutionality of an act of the General Assembly of the commonwealth of Kentucky, entitled "An act dividing the State of Kentucky into 100 representative districts," approved March 23, 1906 (Acts 1906, p. 472, c. 139). They were heard together, and, as they involve the same question, will be treated as one case in this opinion.

In the first case, S. A. Anderson filed a petition in

equity in the Butler circuit court, alleging that he was
a citizen, taxpayer, and voter of that county; that he
possessed all of the qualifications to be a representa-
tive in the Legislature of Kentucky, and was an an-
nounced candidate for the Republican nomination for
the office of representative from the district composed
of Butler and Edmonson counties; that by an act of
the General Assembly of May 3, 1893, Butler and
Edmonson counties constituted the Twenty-Fifth
legislative district, which was entitled to have one
representative in the Legislature; that by the act of
March 23, 1906, Ohio county was joined with Butler
and Edmonson counties, and designated as the
Twenty-Sixth district; that the defendants (appel-
lants) were the Republican chairmen of the three
counties, and under their party law constituted the
committee of the district thus created, and that this
committee have ordered a primary election to be held
in the three counties to name a Republican candidate
for the office of representative; that the plaintiff
(appellee) is a resident of Butler county, and entitled
to be elected by the voters of Butler and Edmonson
counties; that the defendants are proposing to and
will hold a primary election for representative for
the district composed of Ohio, Butler, and Edmonson
counties; and that the plaintiff will be compelled to
submit his claims to the voters of the three counties,
instead of to the voters of Butler and Edmonson
counties, unless the defendants are enjoined from so
doing. In the second case, the appellee Keown filed
a petition in the Ohio circuit court, averring that he
was a citizen, taxpayer, and voter of that county, and
possessed all of the qualifications of a representative
of the Legislature of Kentucky, and he seeks an in-
junction against the clerk of Ohio county restraining

him from refusing to place his name upon the official ballots of that county, and also to restrain him from placing the names of candidates from either of the other counties—Butler or Edmonson—on the official ballots of Ohio county.

In both petitions it is alleged that the act of March 23, 1906, is unconstitutional and void, because it violates section 33 of the Constitution of Kentucky, in that the representative districts constituted by it are grossly unequal both in population and area. In speaking of the inequality of the act under discussion it is alleged as follows:

"It not only in many instances joins more than two counties together to form a representative district—in some cases three, as in the so-called Twenty-Sixth, Seventy-Third, and Ninety-Fifth districts; in some, four, as in the so-called Seventieth and Seventy-First districts—but many of the districts are grossly and outrageously unequal in population, and so much so as not to approximate equality, but shows plainly that the alleged law does not follow even the principle of equality but violates it so grossly as to show that the principle and constitutional rule of equality was not applied at all, but entirely ignored. Thus, according to the census of 1900, Kentucky had a population of 2,147,174, making the average for a representative district 21,471. Under said invalid act 24 of the 100 districts named in it have a population and area as follows:

| District. | County. | Population. | Area. |
|---|---|---|---|
| 99 | Spencer | 7,407 | 204 |
| 25 | Wolfe | 8,764 | 239 |
| 29 | Hancock | 8,914 | 195 |
| 41 | Bullitt | 9,602 | 301 |
| 57 | Anderson | 10,051 | 224 |

Ragland v. Anderson, &c.

| | | | |
|---|---|---|---|
| 30 | Meade | 10,553 | 304 |
| 32 | Larue | 10,764 | 299 |
| 78 | Boone | 11,170 | 242 |
| 21 | Simpson | 11,624 | 190 |
| 63 | Jessamine | 11,925 | 160 |
| 67 | Garrard | 12,042 | 234 |
| 85 | Bracken | 12,137 | 193 |
| 12 | Counties | 124,933 | 2,785 |

"These counties are hardly entitled to 6 but are given 12 representatives.

"Average, one county to district; population, 10,411; area, 232.

| District. | County. | Population. | Area. |
|---|---|---|---|
| 100 | Elliott and Carter | 30,615 | 770 |
| 88 | Fleming and Bath | 31,808 | 589 |
| 3 | Graves | 32,204 | 550 |
| 89 | Lewis and Greenup | 33,300 | 794 |
| 71 | Jackson, Owsley, Perry, and Letcher | 34,883 | 1,240 |
| 97 | Floyd, Knott, and Magoffin | 36,262 | 1,028 |
| 10 | Christian | 37,962 | 694 |
| 98 | Boyd and Lawrence | 38,446 | 608 |
| 95 | Pike, Johnson, and Martin, | 42,196 | 1,250 |
| 69 | Whitley and Knox | 42,387 | 930 |
| 70 | Laurel, Rockcastle, Clay, and Leslie | 53,125 | 1,610 |
| 26 | Ohio, Butler, and Edmonson | 53,263 | 1,241 |
| 12 | 29 counties | 466,451 | 11,304 |
| Average | 2.41 | 38,871 | 942 |

Ragland v. Anderson, &c.

"These counties are entitled to 22, but are given 12 representatives.

"These groups have a population and area as follows:

|  | Population. | Area. |
|---|---|---|
| The first group | 124,933 | 2,785 |
| The second group | 466,451 | 11,304 |
| Difference | 341,518 | 8,519 |

"Spencer county, with a population of 7,407, and an area of 204 square miles, is given one representative, while Ohio, Butler, and Edmonson, with a combined population of 53,263, and an area of 1,241 square miles, is given only one representative.

| District. | County. | Population. | Area. |
|---|---|---|---|
| 99 | Spencer | 7,407 | 204 |
| 26 | Ohio, Butler, and Edmonson | 53,263 | 1,241 |
|  |  | 45,856 | 1,037 |

"The Twenty-Sixth district is more than seven times as large in population as the Ninety-Ninth, the difference being more than enough to constitute two average districts. By this arrangement one citizen of Spencer county has nearly as much voice in the Legislature as eight citizens of Ohio, Butler, and Edmonson.

"The said 100 districts attempted to be created by the said unconstitutional act are not by a great deal as nearly equal as may be without dividing any county, except where a county may include more than one district; and the state can be divided into 100 representative districts, which would be approximately equal in population, without dividing any

county, except where a county may include more than
one district.''

Without analyzing the allegations of the petitions
with overnice particularity, it is deemed sufficient to
say that, in our opinion, they contain such a statement
of facts with reference to the inequality of the repre-
sentative districts of the state that the demurrers,
which confess these allegations, raise sufficiently for
adjudication the validity of the act which is assailed.
The allegations upon which is predicated the infirmity
of the act are substantially the same in both petitions.
General demurrers were filed to each of them, and
overruled by the trial courts. The defendants de-
clined to answer, and thereupon judgments were
entered holding the act of the General Assembly
under discussion invalid, and perpetuating the tempo-
rary injunctions which had been granted at the com-
mencement of the actions. From these judgments
the defendants have appealed.

Section 33 of the Constitution is as follows: ''The
first General Assembly after the adoption of this
Constitution shall divide the state into thirty-eight
senatorial districts, and one hundred representa-
tive districts, as nearly equal in population as
may be without dividing any county, except where a
county may include more than one district, which
district shall constitute the senatorial and representa-
tive districts for ten years. Not more than two
counties shall be joined together to form a representa-
tive district; Provided, in doing so the principle
requiring every district to be as nearly equal in popu-
lation as may be shall not be violated. At the
expiration of that time, the General Assembly shall
then, and every ten years thereafter, redistrict the
state according to this rule, and for the purposes

expressed in this section. If, in making said districts, inequality of population should be unavoidable, any advantage resulting therefrom shall be given to districts having the largest territory. No part of a county shall be added to another county to make a district, and the counties forming a district shall be contiguous."

The first proposition with which we are confronted is raised by the insistence of appellants, that the question involved here is political, and not judicial, and that the courts have not jurisdiction to review the acts of the General Assembly in the matter. To this we cannot agree. It is for the courts to measure the acts of the General Assembly by the standard of the Constitution, and if they are clearly and unequivocally in contravention of its terms, it becomes the duty of the judiciary to so declare. Of course, if the question as to whether or not the legislation is inimical to the Constitution be doubtful, it will always be decided in favor of the constitutionality of the law. But where the matter is plain that the Constitution has been violated, then the courts cannot escape the duty of so declaring whenever the matter is brought to their attention. And no matter how distasteful it may be for the judiciary to review the acts of a co-ordinate branch of the government their duty under their oath of office is imperative.

In the case of Carter County v. Brooks, 80 S. W. 443, 25 Ky. Law Rep. 2284, 118 Ky. 85, there was involved the constitutionality of an act of the General Assembly creating the county of Beckham, and the question arose as to whether or not the new county contained the constitutional requirements to authorize its establishment. In that case, as in this, it was insisted that the question involved was a political one;

that a court of equity had no power to issue an injunction for the enforcement of political rights, and was without jurisdiction to review the acts of the Legislature, it being said that the recitation of the new act as to the facts necessary to the establishment of the new county was conclusive on the courts. In answer to these propositions it was responded in the opinion: "It is the province of the courts to protect private rights under the Constitution. Constitutional guaranties would amount to nothing if there was no way to protect them. The court will not adjudge bad a legislative act on doubtful evidence; but where it is plain that the Constitution has been violated, it is the duty of the court to say what the law is, and protect private rights. Otherwise, the Constitution may be disregarded, and power may be exercised by the Legislature in a case where, under the Constitution, it is without power to act at all, and those whose rights are thus destroyed will be left without remedy. This question was fully considered in Cheaney v. Hooser, 48 Ky. 330, decided in the year 1848, the court holding that the discretion of deciding on all legislative measures is in the Legislature itself, except where the Constitution limits the power of the Legislature, but that a statute is void if in violation of the constitutional limitation on the power of the Legislature; and in that case parol evidence was received to show that private property was taken for public purposes under an act of the Legislature without just compensation. This case was followed in Covington v. Southgate, 54 Ky. 492; Elkton v. Gill, 94 Ky. 138, 14 Ky. Law Rep. 755, 21 S. W. 579, and a number of other cases. There can be no sound reason why the same rule should not apply in the cases of violation of any other constitutional restriction on the

power of the Legislature to the prejudice of private rights.'' The general effect of the opinion in this case is that the court went behind the recitation of facts contained in the act establishing the county, and found it untrue; upheld the power to protect by injunction the rights of the citizens of the old counties who, by the terms of the act, would be put in the new county, and decided that the constitutional provisions with reference to the establishment of a new county were mandatory, and the act of the Legislature unconstitutional.

The case of Neal v. Young, 75 S. W. 1082, 25 Ky. Law Rep. 183, arose on a motion to dissolve an injunction granted by the court below. Although made before Judge Paynter, as a judge of the court of appeals, it was brought before the whole court and treated as a case pending for decision; and it was there held that the courts had jurisdiction to protect political rights by injunction. The question arising on the record was whether or not the state central committee of the Democratic Party could arbitrarily call off a primary election theretofore ordered. In the opinion, Judge Paynter said: ''It was urged in argument that the question here involved is purely a political one, and that the courts should not take jurisdiction of it. My answer is that the court of appeals has a contrary opinion, and in Fagan v. Gerwe, Brown v. Republican County Committee, and Young v. Beckham has held that it had jurisdiction to enforce individual and legal rights.'' To the same effect are Purnell v. Mann, 105 Ky. 87, 48 S. W. 407, 49 S. W. 346, 50 S. W. 264, 20 Ky. Law Rep. 146; Messengale, Clerk, v. Lester, 104 Ky. 191, 20 Ky. Law Rep. 481, 46 S. W. 694; Yates, County Clerk, v. Collins, 118 Ky. 684, 26 Ky. Law Rep. 558, 82 S. W.

382, 973; McPherson v. Blacker, 146 U. S. 2, 13 Sup. Ct. 3, 36 L. Ed. 869.

That the act under discussion is grossly violative of section 33 of the Constitution, in that the injunction as to equality between the districts was not even pretended to be obeyed by the Legislature, is not and cannot be denied. The material allegations of the petitions are admitted by the demurrers; and we have, therefore, before us a redistricting act in which 12 Democratic counties, the population of the largest of which is 12,137, and the smallest, 7,407, are each given a representative. The population of Kentucky, according to the census of 1900, was 2,147,174. This divided by 100—the number of representative districts—produces as the average unit for representation the sum of 21, 471. Tested by this ratio, some of the counties, which are each given a representative, have a population of less than one-half the unit of representation, and the rest have little more than one-half. On the other hand, there are 12 Republican districts composed in large part of two and three counties each, the smallest of which districts has a population of 30,615, and the largest, 53,263, which are only given one representative each. The first 12 districts, composed of one county each, have an aggregate population of 124,933; while the aggregate population of the second 12 districts is 466,451. The first 12 districts were entitled to only 6 representatives, tested by the average ratio, but were given 12. The second 12 districts were entitled to 22 representatives but were only given 12. To take the extremes, Spencer county (which belongs to the first set) has a population of only 7,407, and is given one representative; whereas Ohio, Butler, and Edmonson (which compose the Twenty-Sixth district under the act in

question) have a total population of 53,263, and these together have only one representative. In other words, a voter in Spencer county exercises in the Legislature of the State more than seven times the influence a voter in Ohio, Butler, and Edmonson counties. This inequality is so glaring that it precludes the possibility that there was any attempt on the part of the Legislature to apportion the State into 100 representative districts, as nearly equal in population or area as might be. It needs no argument or elaboration to show that the arrangement of the districts for representation is clearly violative of the constitutional inhibition against inequality.

It has never been doubted in this country since the great case of Marbury v. Madison, 1 Cranch (U. S.) 49, 2 L. Ed. 60, that an act of the legislative part of the government which is contrary to the Constitution is void, and will be so held by the courts whenever brought to their attention. Chief Justice Marshall, upon the subject in hand, said:

"The question, whether an act, repugnant to the Constitution, can become the law of the land, is a question deeply interesting to the United States; but, happily, not of intricacy proportioned to its interest. It seems only necessary to recognize certain principles, supposed to have been long and well established to decide it. That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected. The exercise of this original right is a very great exertion; nor can it nor ought to be frequently repeated. The principles, therefore, so established are deemed fundamental. And as the authority from which they pro-

ceed is supreme, and can seldom act, they are designed to be permanent. This original and supreme will organizes the government, and assigns to different departments their respective powers. It may either stop here, or establish certain limits not to be transcended by those departments. The government of the United States is of the latter description. The powers of the Legislature are defined and limited; and that those limits may not be mistaken or forgotten, the Constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation. It is a proposition too plain to be contested that the Constitution controls any legislative act repugnant to it, or that the Legislature may alter the Constitution by an ordinary act. Between these alternatives there is no middle ground. The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the Legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law; if the latter part be true, then written Constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.

"Certainly all those who have framed written Constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be

that an act of the Legislature repugnant to the Constitution is void. This theory is essentially attached to a written Constitution, and is consequently to be considered by this court as one of the fundamental principles of our society. It is not, therefore, to be lost sight of in the further consideration of this subject. If an act of the Legislature repugnant to the Constitution is void, does it, notwithstanding its invalidity, bind the courts and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration. It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each. So if a law be in opposition to the Constitution, if both the law and the Constitution apply to a particular case, so that the court must either decide that case conformably to the law disregarding the Constitution, or conformably to the Constitution disregarding the law, the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty. If, then, the courts are to regard the Constitution, and the Constitution is superior to any ordinary act of the Legislature, the Constitution, and not such ordinary act, must govern the case to which they both apply. Those, then, who controvert the principle that the Constitution is to be considered in court as a paramount law, are reduced to the necessity of maintaining that courts must close

their eyes on the Constitution, and see only the law. This doctrine would subvert the very foundation of all written Constitutions. It would declare that an act, which, according to the principles and theory of our government, is entirely void, is yet, in practice, completely obligatory. It would declare that if the Legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the Legislature a practical and real omnipotence with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure. That it thus reduces to nothing what we have deemed the greatest improvement on political institutions—a written Constitution—would of itself be sufficient, in America, where written Constitutions have been viewed with so much reverence, for rejecting the construction.''

It is not insisted that the equality of representation is to be made mathematically exact. This is manifestly impossible. All that the Constitution requires is that equality in the representation of the State which an ordinary knowledge of its population and a sense of common justice would suggest. We have not been referred to a more accurate or better description of the equality required by the Constitution than that contained in the report of Daniel Webster, as chairman of a senatorial committee engaged in a duty similar to that involved in the act under discussion: ''The Constitution, therefore, must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring Congress to make an apportionment of representatives among the several states, according to

their respective numbers, as nearly as may be. That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule, merely because the rule of perfect justice cannot be applied. In such a case approximation becomes a rule. It takes the place of the other rule, which would be preferable, but which is found inapplicable, and becomes itself an obligation of binding force. The nearest approximation to exact truth or exact right, when that exact truth or exact right cannot be reached, prevails in other cases, not as a matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind—a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule.''

The definition of equality of representation as above contained, and the principle that any act of the Legislature, which violates a constitutional requirement for that equality of representation, is void, is sustained by the following authority. State v. Cunningham, 83 Wis. 90, 53 N. W. 35, 17 L. R. A. 145, 35 Am. St. Rep. 27; Williams v. Secretary of State (Mich.) 108 N. W. 749; Denney, et al., v. State, 144 Ind. 503, 42 N. E. 929, 31 L. R. A. 126; Harmison v. Ballot Commissioners, 45 W. Va. 179, 31 S. E. 394, 42 L. R. A. 591; State v. Wrightson, 56 N. J. Law 126, 58 Atl. 56, 22 L. R. A. 548; Giddings v. Secretary of State, 93 Mich. 1, 52 N. W. 944, 16 L. R. A. 402; Parker v. State, 133 Ind. 178, 32 N. E. 836, 33 N. E. 119, 18 L. R. A. 567; Commissioners v. Blacker, 92 Mich. 638, 52 N. W. 951, 16 L. R. A. 432; State v. Cunningham, 81 Wis. 440, 51

N. W. 724, 15 L. R. A. 561; People v. Thompson, 155 Ill. 451, 40 N. E. 307; People v. Rice, 135 N. Y. 473, 31 N. E. 921, 16 L. R. A. 836; Baird v. Supervisors, 138 N. Y. 95, 33 N. E. 827, 20 L. R. A. 81. He has studied our Constitution in vain who has not discovered that the keystone of that great instrument is equality— equality of men, equality of representation, equality of burden, and equality of benefits. Section 1 of the Bill of Rights provides: "All men are by nature free and equal. * * *" Section 3: "All men, when they form a social compact are equal. * * *" Section 33 provides for equality of representation. Sections 171, 172, 173, and 174 provide for equality of taxation (uniformity). Section 39 provides for equality (general) of laws. Indeed, it could not be otherwise, for when our forefathers emigrated from their European home it was in the main to escape from the oppression of inequality. They brought with them a burning love for this great democratic principle and imbedded it deep in the foundation of the empire they were destined to erect, and which they will preserve so long as the love of liberty is more than a name. When they threw off the supervising government of the mother country, it was because they were denied equality of representation; or, as they then expressed the evil, they had imposed upon them taxation without representation.

Equality of representation is a vital principle of democracy. In proportion as this is denied or withheld, the government becomes oligarchical or monarchical. Without equality Republican institutions are impossible. Inequality of representation is a tyranny to which no people worthy of freedom will tamely submit. To say that a man in Spencer county shall have seven times as much influence in the govern-

Ragland v. Anderson, &c.

ment of the State as a man in Ohio, Butler, or Edmonson, is to say that six men out of every seven in those counties are not represented in the government at all. They are required to submit to taxation without representation. It was this kind of oppression which inspired that great struggle for freedom which began on Lexington Green in 1775, and ended at Yorktown in 1781. Equality of representation is the basis of patriotism. No citizen will, or ought to, love the state which oppresses him; and that citizen is arbitrarily oppressed who is denied equality of representation with every other citizen of the commonwealth. It is no answer to the demand of appellees that the act of 1906 be declared unconstitutional to say that it will follow that the act of 1893 must also be declared unconstitutional, because it created unequal representative districts, although in a less degree than that of 1906. The conclusion sought to be drawn does not follow. The act of 1893 has gone into effect, and the government has been organized under it. To hold it void would be to throw the government into chaos; and this no court is required to do. It is now too late to question its validity. The next Legislature must be elected under it, and then we have no doubt the members, impelled by their sense of duty, the obligations of their oath of office, together with that spirit of justice which is the heritage of the race, will redistrict the State as the Constitution requires.

In conclusion, we do not agree with appellees that section 33 forbids more than two counties to be joined in one district. Without elaboration, we are of opinion that more than two counties may be joined in one district, provided it be necessary in order to effectuate that equality of representation which the

spirit of the whole section so imperatively demands. It may not be inappropriate, however, to say that it is difficult at this time to see how this necessity can often arise. But it must be remembered that Constitutions are established for the exigencies of long periods of time, and it cannot now be told what the future may bring forth.

For the foregoing reasons, the judgment holding the redistricting act of March, 1906, void, must be affirmed; and it is so ordered. Whole court sitting.

Petition by appellee for modification of opinion overruled.